DANIEL CARVILLE *vs.* INHABITANTS OF WESTFORD.
MARTHA CARVILLE *vs.* SAME.

Middlesex.   March 12, 1895. — May 25, 1895.

Present: FIELD, C. J., ALLEN, MORTON, & BARKER, JJ.

*Personal Injuries — Defective Highway — Want of Barrier or Railing — Due Care — Negligence — Evidence — Witness.*

Evidence that a witness of the adverse party had made statements out of court inconsistent with his testimony is admissible without first calling the attention of such witness, when testifying, to the time, place, or circumstances of the alleged contradictory statements.

A town may be found to be liable for damages where a heavily loaded four-horse wagon is thrown into the gutter by the passing of the rear wheel over a stone on the surface of a narrow rounded and icy roadway at a point not far from a culvert through which a brook crosses the roadway, and where, in the attempt to get the wagon again upon the usual path without unloading it, it is overturned and carried into the brook.

A jury may find that a rounded roadway only eleven feet wide and covered at least in part with smooth hard ice, and with a steep slope at the side into a gutter encumbered with snow, where the roadway is crossed by a brook, and with

no railing by the side of the roadway or upon the culvert, is a defective way, even in a sparsely settled locality, and at the season when sleighing has just ended and travel is upon wheels.

TWO ACTIONS OF TORT, for personal injuries, and for damages to property, sustained by the plaintiffs by reason of a defective highway in the defendant town.

Trial in the Superior Court, before *Bishop,* J., who allowed a bill of exceptions in substance as follows.

The way upon which the accident occurred was in a thinly settled part of the town, but it was one which the town was bound to maintain and keep in repair. It extended east and west, and was principally used as a means of communication between three houses abutting on it and a quarry at the easterly end thereof. Near the place of the accident it crossed a brook by means of a culvert covered with flat stones and gravel, and at the northerly side of the culvert was a driveway leading through the brook, which at the time of the accident was not in condition for use. The plaintiff Daniel Carville testified that he was a teamster, and that at the time of the accident, on March 18, 1891, he was engaged in hauling stone from the quarry, using for this purpose a "stone wagon," ten or eleven feet long, and about six feet wide from wheel to wheel, and four horses, one of which was owned by Martha Carville, the other plaintiff; that he had already passed over the road four times on the day of the accident, and six times on the day before; that in the afternoon of March 18, while making his fifth trip, travelling westerly, and when he was within a few feet of the culvert, his "hind wheel struck a little cobble," and glanced off the road, going down about a foot or a foot and a half out of the road-bed; that he then stopped his horses, took off his leaders, hitched them to the rear of his wagon and tried to start his load back, but could not do so; that he then replaced his lead horses in front of the load, as before, reined them across the road to the left and attempted to start, but that the leaders would not pull; that one Porter, who was hauling wood, then came up, and his horses having been substituted for the plaintiff's lead horses, the plaintiff Daniel Carville again reined the horses across the road, started the load about a foot or a foot and a half, and stopped to see how the wagon was coming;

that it seemed to be coming into the road all right, and so he started again; and that the load moved forward about a foot, and then tipped over into the brook, drawing the pole or wheel horses in with it. The plaintiff further testified that the road-bed at the place of the accident was eleven or twelve feet wide, and rounded, having ice in the centre and snow along the edges; that the water in the brook was almost up to the top of the bridge; that on each side of the road-bed there was a sharp slope, which on the northerly side of the road was four or five feet in depth; and that there was no rail or barrier to prevent teams from going over the embankment, and that cobble stones were scattered in the road all the way down from the quarry.

On cross-examination he testified that there were no ruts in the ice on the road and bridge made by wagon wheels, but that there were white marks in the ice about a quarter of an inch in depth made by loaded teams passing over it, in which the plaintiff's team travelled until the wheel struck a stone and glanced off; that the plaintiff saw the stone in the rut ahead of him; that the wheel was thrown about a foot or a foot and a half out of the track at a distance of about eighteen or twenty feet, and not sixty feet, from the culvert; that after the wagon left the rut he started it twice before it went over, and the first time it moved about a foot, and the second time about six inches; that from the time it left the rut until it tipped over, it did not go more than eighteen inches; that it was but a short distance back to the quarry where he could have obtained implements with which to have cut a rut or track through which the wheel could have been drawn back into the road; that the lead horses might have slipped a little, although they had been sharpened a week or two weeks before, and the pole horses had been sharpened two or three days before by Woodward, a blacksmith, but that the danger was caused by the ice upon the road, and that he had not said that he would go into the brook or into the road.

One Henry A. Fletcher testified, for the plaintiff, that at the time of the accident the road was covered with ice and had snow for a hundred feet on either side of the bridge; that there was a slope from each side of the road-bed extending from sixty to seventy feet in either direction from the brook,

varying in depth, but being about four feet deep at the bridge; that at the time of the accident the culvert was very nearly filled with water, and that there was so much snow on each side of the road as to prevent any one from observing the abruptness of the slope of the bank. He further testified that an average of about thirty teams passed daily over the road.

One Wilson also testified, for the plaintiffs, that he was with the plaintiff Daniel Carville at the time of the accident, walking behind his team; that the horses seemed to walk along all right until they came close to the bridge, when the witness saw the wagon jump off the road, which was steep down on each side; that the witness and Daniel Carville started the horses, and did everything they could; that they got some other horses and put them on ahead, and pulled the team one way and another, and tried to pull it back with another team hitched to the rear end, until finally the plaintiff's wagon settled and went over; that the wheel went off the road ten to fifteen feet back from the bridge, at which time the lead horses were across the bridge and the pole horses were on it; that he heard no one suggest to Carville that if he did not look out he would get into the brook; and that Carville did not say that he would get the wagon out or get into the brook.

One Hill, also called as a witness by the plaintiffs, testified that he went over the road on the day after the accident; that the road was rounding, filled with ice in the middle, and went right off sloping; that there was snow on each side; and that there was nothing to prevent the wheels of the wagon from going off.

One Herbert E. Fletcher, also called as a witness for the plaintiffs, and who lived on the road, testified that just prior to the accident the road was narrow and icy.

The defendant called as a witness one Smith, an engineer, who testified, from measurements made by him, that the travelled part of the road-bed at the culvert, and for a distance of about fifty or sixty feet easterly thereof, was eleven feet wide between the points where it began to fall off; that it was twelve to thirteen feet between the banks or slopes, the culvert was sixteen feet long, and the road at the culvert eleven feet wide; that at a point twenty-one feet from the culvert the road slope, on the

side where the accident occurred, was of 3.6 base and 2.6 fall, and at a point about fifty feet from the culvert the slope was 4.8 base and two feet fall, and continued to grow less until there was practically no slope at a distance of about sixty feet from the culvert; that the plaintiff's load of stone at the side of the road was about eighteen feet easterly of the culvert, and that there were stone or granite chips about sixty-five feet therefrom in the same direction, lying in the road, and about on a level with its surface; and that the road was very nearly level for a distance of one hundred feet east of the culvert.

Joseph H. Sears, also called as a witness for the defendant, testified that he saw the plaintiff's wagon when it tipped over; that he saw where the wheels left the rut, which was at the stone chips about sixty or sixty-five feet east from the culvert; that he saw the track on the ice made by the wagon wheel after it left the rut, and that it ran along near the bottom of the slope for a distance of forty to forty-five feet, to the point where it tipped over; that the ruts were from one to two inches in depth, and passed along about the centre of the road for one hundred feet or more easterly of the culvert; and that from the culvert to the stone chips it was from two and a half to three feet between the ruts on either side and the edge of the slope, and that the ice was even and level over the road. He further testified that he heard Porter tell the plaintiff Daniel Carville that if he attempted to go forward he would go into the brook, to which Carville, who appeared a little excited, replied with an oath that he would pull the load out or go into the brook; that it was two to three feet from the right hand rut to the edge of the slope at the point where the wagon tipped over; and that when he first saw the wagon the right wheel was from four to five feet outside the right hand rut, and about three feet down the slope.

John H. Porter, also called as a witness by the defendant, testified that he was present at the time of the accident; that there were ruts in the ice, but otherwise the ice was level and even over the travelled part; that it was from two and a half to three feet from the ruts to the edge of the slope on either side of the road as far back as to the stone chips, including the place where the wagon tipped over; that the right wheel of the wagon was four to five feet outside of the right hand rut, and about

three feet down the slope. He further testified that the plaintiff Daniel Carville's wagon was so far off that the witness did not think it could be brought up, and told Carville that it was dangerous to attempt it, to which Carville, with an oath, replied, " I 'll go into the brook, or pull out "; that the plaintiffs' horses slipped; that the witness suggested to Carville to unload the stone or to get another wagon, and to put the stone into it; and that he told Carville to take his leaders off and that the witness would put his own horses on, which he did, whereupon they started the wagon and stopped and put on another horse ahead of the witness's, and let the three horses out with a chain its full length some ten feet from the end of the pole; and that Carville unhitched the pole so that, if it went over, it would not pull the witness's horses into the brook.

One Edwards, also called as a witness by the defendant, testified that he teamed over the road the day before and the day after the accident, drawing with two horses one and a half to two tons, and had no difficulty in passing over the road; that the wheel ruts were one and a half to two inches deep, and kept the wheels all right; and that, except in the wheel ruts, the ice was level and even in the road-bed. He also described the location of the ruts, the width of the margin, and the track made by the plaintiffs' wagon wheel after it left the rut, in substantially the same manner as was done by Sears and Porter.

Henry Chamberlain, the road commissioner, also testified for the defendant that, with the selectmen, he went to the place of the accident on March 21; that there were wheel ruts in the ice, and that the marks made by the plaintiffs' wagon wheel on the side of the road-bed were plain to be seen; that he followed them from where the wheel left the rut to where the wagon tipped over; that by measurement it was sixty-five feet from where the wheel left the rut to the culvert; and that the ice in the road-bed was level and even.

One Haywood testified, for the defendant, that he saw the marks of the plaintiffs' wagon wheel on the ice at the side of the road; and that the surface of the road-bed was level, and covered with smooth ice into which wheels had cut on the travelled part of the road, making ruts which teams followed. Both he and one S. H. Fletcher testified that the distance from where the wheel left the rut to the culvert was about four rods.

The last three witnesses testified to the same facts as Sears and Porter did, as to the ice and ruts in the highway, the location of the ruts, and the width of the margin of the road outside the ruts, and the length and location of the track made by the plaintiff Daniel Carville's wagon wheel. They also testified that they had passed over the road at the place of the accident several times, and had never observed anything dangerous or defective about it.

One Woodward, a blacksmith, testified that he shod no horses for Carville in January, February, or March of 1891, and John N. Carter and Peter Corr, witnesses for the defendant, testified that they had a conversation with the plaintiff Daniel Carville in September, 1892, in which he told them that neither his horses, wagon, nor harness were injured in the accident ; that he caught a little cold himself, and did not work for a few days ; that he could have worked, but as the town of Westford was good for it, he proposed to make it pay.

The plaintiff Daniel Carville testified in rebuttal, and denied having made the statements alleged by Carter and Corr. He was asked by his counsel whether he had had a talk with the witness Porter, in which the latter had said anything about what he was alleged to have said to the plaintiff Daniel Carville about going into the brook, or about it being dangerous to attempt to go forward, as testified to by Porter. To this question the defendant objected, on the ground that it called for evidence tending to impeach the testimony given by Porter by showing that he had made statements out of court inconsistent therewith, and that a proper foundation for such testimony had not been laid by calling the attention of Porter, when testifying, to the time, place, and subject matter of the statements alleged to have been made by him. The judge overruled the objection, and admitted the testimony, subject to the exception of the defendant. The plaintiff Daniel Carville then stated that on a previous day, in the court-room and in the presence of his counsel, Porter told him that nothing had been said by him, Porter, at the time of the accident to the witness, about it being dangerous to start forward, or by Carville about going in or out of the brook, as testified by Porter and Sears at the trial.

Porter, being recalled by the defendant in rebuttal, denied having told Carville that nothing was said by him at the time of

the accident about it being dangerous to start forward, or by Carville about going into the brook or out of it.

At the close of the evidence, the defendant requested the judge to rule that the evidence did not warrant a verdict for the plaintiffs; but the judge declined so to rule, and the defendant excepted.

The defendant then requested the judge to instruct the jury as follows:

"1. If the plaintiff saw ice and snow in the road before he reached it, and knew, or had reasonable cause to believe, that the road was thereby rendered dangerous to travellers thereon, and he voluntarily proceeded to pass over the same, he took upon himself the risk, and if he sustained actual damage by reason thereof, he cannot recover.

"2. If the plaintiff was in such a position that it was his duty to do something which, if done in a particular way, would be dangerous, but if done in another way would not, he is bound to adopt the latter course. If his choice is open to him, and he voluntarily exposes himself to danger, he cannot recover.

"3. Whenever a railing is required by the side of a way, it is such a railing as is suitable for the ordinary exigencies of travel upon such a road at such a place; and the defendant town is not liable for the want of a railing, even if one was required, if the same would not have prevented the happening of the injury complained of."

The judge declined to give the rulings requested, except so far as they were covered by the instructions to the jury, which were in substance as follows.

There is no liability for injuries received from defects in the condition of the highway except under the provisions of the statute. This liability rests upon the principle of law that whoever suffers in his person or property by reason of a defect upon a way which a town or city is bound to maintain, which might have been remedied, or the dangers arising from which might have been prevented, by the exercise of due care on the part of the city or town, shall have a right to recover for the same, provided the city or town had reasonable notice of the defect, or by the exercise of due diligence might have had such notice; provided that the person making the claim was himself in the exer-

cise of due care at the time; that whenever a person seeks in an action to recover from a town for injuries sustained by reason of a defect in a way, he must show affirmatively, first, that he was in the exercise of due care, and, secondly, that the town was not in the exercise of due care, or, as in this case, that there was a defect which arose from the lack of the exercise of due care; and that if the circumstances in regard to care on the part of the plaintiff are equally consistent with care and negligence, then he fails to show that he was in the exercise of due care, and cannot recover; that mere slipperiness or a merely icy condition of a place caused by the elements upon a surface which was otherwise proper was not a defect; that while the principle of what constitutes a defect is the same in a city or town that is wealthy or poor, in a city or populous town or in the remote extremity of a sparsely settled town the application is different; in either case the city or town is bound to do all that can reasonably be required of it, and nothing more; that where there is constant and frequent passage in the streets the application of this principle will require a much greater exertion of force and power, and a much larger expenditure of money, than in a country road where there is little travel, and where neither the resources of the town nor the exigencies of the place itself in the road determine that it is reasonable that the town should do as much as in the more thickly populated and frequently travelled place; that the contention of the plaintiff was that the road was narrower at the place of the accident than it should have been, which narrowness, taken in connection with the want of a barrier and the icy condition of the place, constituted a defect against which the town was bound to guard; that, on the other hand, the defendant contended that the road, not being much frequented, and being in a remote part of the town, was suitable and proper for that place; that in determining whether the way was defective the condition and location of that way in particular, and no other, was to be considered, and it was for the jury to say whether it was in such a condition as the defendant, having regard to all the circumstances of the case, was bound to have remedied by the substitution of a better road.

The next question is whether the plaintiff was in the exercise of due care. In order to determine this question, it is necessary

to ascertain what the facts are, because there is a serious conflict of testimony as to how the accident occurred. There is opposing testimony here which is entitled to careful consideration. Carville says: " I came down to the bridge there and my hind wheel struck a little cobble and it glanced, and the wheel slipped down about a foot or a foot and a half off the road. I stopped the team and pulled my horses across the road. My lead horses would not take hold and pull the second time; Mr. Porter came along and put his horses on, and then an attempt to pull across was made and the accident occurred." That is, Carville says he came down in the place where the wheels ordinarily went until he came to this little stone; that the hind wheel struck it, the wagon glanced off, and that was the cause of the wagon getting off from its right position in the road. He says the road was about eleven feet from shoulder to shoulder, and, in regard to that, there is no great difference of testimony between him and Smith, the engineer on the other side. Carville gives the slope according to his judgment, and the engineer gives it according to measurement. Carville says there were no ruts in the ice where the teams had travelled over it; that there might have been white marks on it where teams went over it, a quarter of an inch in depth, but no ruts of any considerable depth; that the wagon wheel struck the stone and glanced out into the snow, and that, before that, the wheels had been in the ruts; that they were thrown out from a foot to a foot and a half; that it is not true that the wagon wheel went out of the rut sixty feet back from the bridge, he is sure of that; that he remembered the little stone and saw it just ahead of him; that it threw the wagon wheel out a foot or more; and that he stopped right there. He denies that he was told by Porter that the team would go into the brook, or that he, Carville, said that he would go into the brook or out of it, or that the pole was unhitched or the chain lengthened for Porter's horses. His contention is that coming up in the regular place for wheels, not in deep ruts because he denies that there were any, but along where the wheel marks went regularly, — coming up there until he got to this stone he struck the stone, and that striking the stone caused the wheel to glance off, carrying the wagon off, and was the cause of the wagon being off the regular place; and he denies that he

was informed or notified by anybody that the wagon was likely to go into the brook, or that he said that he would bring it out or else into the brook.

The defendant's contention is that the wheels went off from the regular wheel tracks, regular places in the road where the wheels ordinarily went and should have gone, from sixty to sixty-five feet before reaching the bridge, and kept going off until they got down to the place where the bank was deeper, and that the wheel kept going along on the bank, which became deeper and deeper, until the wagon got thirty or forty feet away from the place where the wheels first went off from the marks or ruts in the road; that then the off wheel had got something like four or five feet over from the wheel rut, and two or three feet over from the shoulder of the slope, when Carville stopped; that then he was trying to bring his load up by his own lead horses, who would not pull; and that Porter came along and assisted him; that Porter distinctly told him that he would have his team in the brook if he attempted to get it up in that way, to which Carville replied that he would have it into the brook or out of it. Further, the defendant contends that Carville was negligent, having passed over the road several times and being familiar with it, in attempting to go over the road at all, especially with horses which, as the defendant says, were not sharp-shod.

If there was a defect in the road there which the town of Westford was bound to guard against, and Carville used due care, all that a reasonable man could be asked to do, he may recover, but he cannot recover if there was no defect there, nor can he recover whether there was a defect there or not if at the time of the accident and before it he was guilty of negligence and was not in the exercise of due care. Upon all the evidence in this case, and upon the principles which ought to govern in considering the evidence, it was for the jury to say, first, whether there was a defect there, that is, whether there was such a condition of things in that road at that place as, having a due regard for its duties, and also due regard to its power and resources, the town of Westford was bound to have made it better and more secure for travel for those who should pass over it; and if that is so, then, secondly, whether the plaintiff Daniel Carville has shown to you that he was in the exercise of due

care upon this occasion. Due care means the same sort of care which any man of reasonable prudence under the same or like circumstances would have exercised ; and the jury, considering themselves as persons of ordinary prudence and caution, might well ask themselves what would any one of them have done under the same circumstances.

The judge then put to the jury three questions, to be answered in writing: "1. Was there a defect or want of repair, or of a sufficient railing, at the place in question, which might have been remedied, or the damage from which might have been prevented, by the exercise of reasonable care and diligence on the part of the town? 2. If so, did the town have reasonable notice of such defect, or might the town by the exercise of proper care and diligence have had notice of it? 3. Was the plaintiff Daniel Carville in the exercise of due care in what he did at and immediately before the time of the accident? "

The jury answered each of these questions in the affirmative, and returned a verdict for the plaintiff in each case ; and the defendant alleged exceptions.

*J. C. Burke*, for the defendant.

*F. W. Qua*, for the plaintiffs.

BARKER, J.　These were actions for personal injury and for damages to property sustained by reason of a defective highway. The accident occurred on March 18, 1891, when, although wagons were in use, there was still ice and snow upon the road, which was in a thinly settled part of the town. The plaintiff Daniel Carville was driving a team of four horses, which were drawing a wagon heavily loaded with stone. The wrought roadway was said by witnesses to have been from ten to thirteen feet wide from shoulder to shoulder, with a slope into the gutter upon the right as the team was going of from two feet to two and a half feet in depth, and the road was crossed by a brook which was carried under the roadway by a culvert covered with flat stones, the perpendicular distance from the top of the culvert to the bottom of the brook being about four feet.

The brook filled the culvert, so that, although there was another driveway through the brook, it was not in a condition for use. The width and configuration of the travelled way, the amount and condition of the ice upon it and of the snow in the

gutters, and the exact place and manner of the accident were in dispute. It appears, however, that in some manner, at a point either about sixty-five feet from the culvert, or very near the culvert, the off rear wheel of the wagon left the travelled path and went down the slope into the gutter, and in an attempt to get the wagon again upon the usual path the wagon was overturned, and it and the wheel horses carried into the brook, and the injuries for which the actions are brought were occasioned.

One of the defects alleged in the declaration was a want of a sufficient railing, and the evidence was that there was no railing by the side of the wrought way. The plaintiffs contended that the road was narrower than it ought to have been, and rounding, and that the narrowness with the want of a barrier and the icy condition produced a defect in the whole situation arising from those circumstances ; while the defendant contended that there was no defect, that the driver took upon himself the risk of an overturn, and that the accident was due to his negligence.

We consider only the questions raised by the defendant's brief and argument. The first is a question of evidence. Evidence was admitted to show that a witness called by the defendant had made out of court statements inconsistent with his testimony. The defendant contends that because the attention of its witness was not called to the time, place, and circumstances of his alleged contradictory statements when he was himself upon the stand, the evidence was inadmissible. But such a course is not necessary under our practice, when the witness is called by the opposite party. *Gould* v. *Norfolk Lead Co.* 9 Cush. 338. *Blake* v. *Stoddard*, 107 Mass. 111.

The other questions for decision arise upon the defendant's requests for rulings, that the evidence did not warrant verdicts for the plaintiffs ; that if the driver saw the ice and snow before he reached it and knew that the road was dangerous, and voluntarily proceeded, he took the risk upon himself ; and that if the driver was in such a position that it was his duty to do something which if done in one way would be dangerous but in another way would not, he was bound to adopt the latter course, and if he voluntarily adopted the dangerous one the plaintiffs could not recover. So far as the requests were correct in law, we think they were in substance given in the charge.

While an examination of the testimony as it is reported gives us the impression that the defendant ought to have prevailed, we cannot say that, as matter of law, verdicts should have been ordered for the defendant. The jury would have been justified in finding that the way was not defective, and also that the driver not only failed to act with ordinary care, but recklessly and in disregard of the warning of others present brought on the accident by so attempting to pull the wagon again upon the roadway that the only result which could be reasonably expected was an overturn into the brook. But upon all these points there was a decided conflict of testimony, and there was evidence upon which the jury might find that the way was defective, and that the driver acted with ordinary care, and that the accident would not have occurred if the way had been reasonably safe and convenient.

A jury may find that a rounded roadway only eleven feet wide, and covered at least in part with smooth hard ice, and with a steep slope at the side into a gutter encumbered with snow where the roadway is crossed by a brook, and with no railing by the side of the roadway or upon the culvert, is a defective way, even in a sparsely settled locality and at the season when sleighing has just ended and travel is upon wheels.

So, too, a jury may find that when the off rear wheel of a four-horse wagon loaded with stone has been thrown into a gutter by passing over a stone upon the surface of a narrow, rounded, and icy roadway, at a point sixty-five feet from a culvert through which a brook crosses the roadway, the driver may in the exercise of due care attempt to pull the wagon back upon the usual path without unloading it, and may even continue his attempt until the wagon is overturned into the brook. Whether in this instance the driver's attempt, persisted in until the accident, was an exercise of ordinary care, was a question of fact for the jury. So, too, whether under all the circumstances the danger was so obvious and great and the exigency so slight as to make it a want of ordinary care for the driver to attempt to pass over the road, was a question for the jury. Although the driver knew the situation, it cannot be said, as matter of law, that he was not warranted in driving over the road, which was in common use by others as well as by himself. *Pomeroy* v. *Westfield*, 154 Mass. 462, 465. *Coffin* v. *Palmer*, 162 Mass. 192.

It was in our opinion the duty of the presiding justice to submit to the jury the conflicting evidence bearing upon the questions whether the way was defective, and whether the plaintiffs were injured or their property damaged solely by reason of the defect, and not by the recklessness or want of care of one of the plaintiffs, who was in charge of the horses and wagon.   The instructions given were accurate and careful, and gave proper rules for the guidance of the jury.                    *Exceptions overruled.*